# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF FLORIDA
# PANAMA CITY DIVISION

**RICHARD L. JOHNSON,**

    **Plaintiff,**

**vs.**                                              **Case No. 5:04cv144-RH/WCS**

**NURSE D. KENT,**

    **Defendant.**

_____/

## REPORT AND RECOMMENDATION

On September 14, 2004, Plaintiff filed an amended complaint, doc. 12, against the Defendant, a nurse at Washington Correctional Institution where Plaintiff was incarcerated at the time of the events at issue. After service of process was finally completed, *see* docs. 29-30, and several extensions of time were provided, *see* docs. 34-35, 39-40, and 42, Defendant filed a "motion to dismiss the ADA/RA claims" from Plaintiff's complaint, doc. 46, simultaneously with the special report, doc. 47. The special report was construed as a motion for summary judgment, and Plaintiff advised of his obligation to respond pursuant to Rule 56.[1] Doc. 51.

---

[1] In construing the special report, doc. 47, as a summary judgment motion, the document now is listed on the electronic docket as both documents 47 (special report) and 52. This report and recommendation will cite to the motion for summary judgment as document 47.

**I.      Procedural Issue**

In Defendant's "motion to dismiss the ADA/RA claims" from Plaintiff's complaint, doc. 46, it is argued that Plaintiff's ADA and Rehabilitation Act claims are unexhausted and should, therefore, be dismissed under 42 U.S.C. § 1997e.  Doc. 46.  In responding to the motion, Plaintiff, a *pro se* inmate, clarified that he intended to file a § 1983 civil rights suit alleging an Eighth Amendment violation and did not intend to raise separate and distinct claims under the ADA or the Rehabilitation Act.  Doc. 49.  Thus, the motion to dismiss, doc. 46, was denied as moot in light of Plaintiff's explanation and the only claims raised in this case are the Eighth and Fourteenth Amendment (Equal Protection Clause) claims.  Doc. 51.

**II.     Allegations of the amended complaint, doc. 12**

Plaintiff is diabetic.  On the morning of July 19, 2003, Plaintiff alleges that he became unconscious.  Defendant Kent was called to the scene and, it is alleged, upon arrival told Plaintiff (with expletives) to get up, that she did not have time for this.  Plaintiff alleges he did not move or speak.  Two inmates who were nearby attempted to put Plaintiff in a wheelchair, but the Defendant intervened and told them to let Plaintiff get in the chair himself.  Plaintiff still was not moving, however, so a correctional officer intervened and told the inmates to put Plaintiff in the wheelchair and take Plaintiff to the medical department.  Once there, and while Plaintiff was still unconscious, Defendant Kent allegedly "shoved tubes of gel glucose medicines down" Plaintiff's throat, but Plaintiff states that he could not swallow and he threw up.  Plaintiff alleges that the instructions on the glucose gels advise not to administer to anyone who is unconscious

or cannot swallow. Another inmate then asked Defendant Kent if he could feed the glucose to Plaintiff and after agreeing, the Defendant left the area. *Id.*

Plaintiff contends that Defendant Kent "jeopardized Plaintiff's life" and violated the Eighth Amendment by her actions in failing to treat him. Doc. 12. He claims that as a result of Defendant Kent's actions, Plaintiff suffered "sharp pains during the event," and now suffers "complications in swallowing and shortest [sic] of the breath." *Id.* Plaintiff also asserts that the Defendant's actions were intended to discriminate against Plaintiff because he is black, a homosexual, and has both HIV and diabetes. *Id.* While he mentions the Americans with Disabilities Act and the Rehabilitation Act, Doc. 12, p. 8, he has dismissed those claims, leaving only an Eighth Amendment claim. Doc. 49.

## III. Legal standards governing a motion for summary judgment

On a motion for summary judgment, the Defendant initially has the burden to demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986). If accomplished, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial. *Id.* An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004)(citations omitted). Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law." <u>Hickson Corp.</u>, 357 F.3d at 1260, *quoting* <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986). All reasonable inferences must be resolved in the light most favorable to the nonmoving party. <u>Watkins v. Ford Motor Co.</u>, 190 F.3d 1213, 1216 (11th Cir. 1999).

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " <u>Owen v. Wille</u>, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)). The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c). <u>Owen v. Wille</u>, 117 F.3d at 1236; <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553.

Here, Plaintiff's response contains a statement of facts as to which Plaintiff contends there is a genuine dispute such that this case should go to trial. Doc. 53, p. 17, *et seq*. Plaintiff has also presented argument in his memorandum of law. Plaintiff has not, however, come forward with evidence pursuant to F<small>ED</small>. R. C<small>IV</small>. P. 56 to support

his claims.[2] Accordingly, Defendant's evidence must be considered unrebutted. It is not enough to argue that the facts are disputed.[3]

---

[2] Plaintiff argues that Defendant did not provide the Court with Plaintiff's affidavit or the affidavit of some other individuals who Plaintiff contends have knowledge of the events in question. Doc. 53, p. 2. Plaintiff, however, could have submitted his own affidavit as evidence, or the affidavits of others, and was specifically advised that he could do so. Doc. 51.

[3] Plaintiff asserts in his memorandum that he disputes testimony and evidence presented by Defendant, but does not provide *evidence* to show there is a genuine dispute of material fact. The argument by itself is insufficient. Plaintiff was advised that he must come forward with evidence under FED. R. CIV. P. 56. Doc. 51.

### IV.     The relevant Rule 56(e) evidence

In addition to other serious medical conditions, including HIV and hypertension, Plaintiff has type 2 diabetes.  Doc. 47, p. 2 and ex. A, p. 9.[4]  The evidence is that on July 19, 2003, Plaintiff "was treated for hypoglycemia by Nurse Rudolph."  Ex. A, p. 10.  Plaintiff "arrived in medical at about noon on July 19, 2003[,] and exhibited signs of low blood glucose."  *Id.*  Plaintiff was "lethargic and sweating, and his blood glucose registered at 36 mg/dL on the Accu-Check monitor."  *Id.*[5]  "Nurse Rudolph gave [Plaintiff] two tubes of glucose gel and sugar water, and placed him in the infirmary for observation for two hours."  *Id.*  Plaintiff's blood sugar increased sufficiently and Plaintiff was released back to the dormitory.  *Id.*

Plaintiff's medical records relevant to this incident are exhibit B.  Ex. B, p. 42; *see also* ex. C, p. 6.[6]  The signature for the medical person providing care to Plaintiff on July 19, 2003, is "K. Rudolph, SRN."  Ex. B, p. 42.  The generic nursing assessment form states that Plaintiff was seen at 1200 and was "given glucose x 2 tubes & sugar H20."  *Id.*  Plaintiff was placed in the infirmary for a period of time and, after rechecking his blood sugar level, the medical record notes Plaintiff was "discharged back to dorm."  *Id.*

---

[4] All exhibits referenced are to those attached to the special report, doc. 47.  Hereafter, the exhibits will simply be cited to by exhibit and page number.

[5] Plaintiff's body weight was 147 pounds.  Ex. A, p. 10.

[6] It is noted that Defendant Kent has provided a "generic nursing assessment" form to show the medical treatment provided to Plaintiff on July 19, 2003.  Ex. B, p. 42.  However, the "chronological record of health care" forms which are provided as evidence do not contain any entries for July 19th.  Rather those records show treatment on July 16, 2003 (by Defendant Kent), July 17th, and July 18th, and then skip to July 22, 2003.  Ex. B, pp. 40, 43.  While this omission is a concern, in light of the lack of evidence from Plaintiff, it is not determinative.

Kathleen Rudolph is a Senior registered Nurse who has worked at Washington Correctional Institution since 1994. Ex. C, p. 2.[7] Nurse Rudolph submitted an affidavit as part of the evidence in this case and states that she has "no memory or independent recollection of the July 19, 2003[,] incident [Plaintiff] refers to in his complaint." *Id.* Nurse Rudolph states that hypoglycemia is a fairly common problem in prison and she has attended to many such conditions on a daily basis. *Id.* She states: "[U]nless something extraordinary or unusual occurs, or an incident is very recent, [she] simply cannot remember particular details or medical incidents." *Id.* Nurse Rudolph cannot recall whether she "responded to a call in the dormitory" in treating Plaintiff and has "no independent recollection of what occurred when [Plaintiff] arrived in medical that day." *Id.* Nurse Rudolph averred that the signature on Plaintiff's medical records on July 19, 2003, is her signature. *Id.* She said that her signature on the Generic Nursing Assessment form "means that [she] treated or assisted in treating [Plaintiff] for hypoglycemia at approximately noon in medical that day." *Id.* Nurse Rudolph cannot recall whether she treated Plaintiff alone or could have been working with Defendant Kent in treating Plaintiff. *Id.*

Despite Nurse Rudolph's lack of memory concerning the events of July 19, 2003, she "can state with absolute certainty" by relying on her experience, her notes on the medical records, and the manner in which she routinely treats "patients for hypoglycemia, that [Plaintiff] was not unconscious when he arrived in medical or while he was being treated in medical." *Id.* Had Plaintiff been "unconscious, [Nurse Rudolph] would have documented his condition in his file, plus the treatment would have been entirely

---

[7] On the Court's electronic docket, exhibit C is attachment 3 of the special report.

Case No. 5:04cv144-RH/WCS

different than the method for treating hypoglycemia in a conscious patient." *Id.* Plaintiff would have been taken "to the emergency room and, with a doctor's order," he would have been placed on a gurney and "administered D50 (50% dextrose) by IV push." *Id.* This treatment and Plaintiff's medical condition would have been documented in the medical file. *Id.* Nurse Rudolph's notes indicate only that Plaintiff "was lethargic and diaphoretic (sweating) due to low blood sugar." *Id.* The treatment Plaintiff received was proper for the symptoms which Plaintiff presented. *Id.*

Moreover, Nurse Rudolph states "with certainty that [Plaintiff] did not vomit when given glucose gel." *Id.* If Plaintiff had vomited, a notation would have been made in the medical records. *Id.* Nurse Rudolph also states that she "would have remembered such [a] reaction because it is atypical." *Id.* In ten years of providing treatment to inmates at Washington Correctional Institution, Nurse Rudolph does "not recall ever seeing or hearing of an inmate vomiting during or after taking glucose gel." *Id.*, at 2-3.

Nurse Rudolph states that she "would never allow an inmate to have any involvement in treating [Plaintiff] or any other inmate." *Id.*, at 3. Nurse Rudolph states affirmatively that another inmate would not have administered the glucose gel to Plaintiff "in her presence [or] under [her] care." *Id.*

On August 3, 2003, Plaintiff submitted an informal grievance concerning the July 19th incident in which he alleged that Defendant Kent "tried to kill" him. Ex. D, pp. 8-9; ex. E, pp. 1-2. Plaintiff also claimed that he did not know the name of the nurse (the named Defendant in this case) until August 3, 2003. *Id.* However, Defendant's evidence is that following the treatment on July 19th by Nurse Rudolph, Plaintiff was treated on July 20th by Defendant Kent. Ex. D, pp. 1-2, 5. Although Defendant Kent

also has no independent recollection of providing medical care to Plaintiff, she reviewed her notes in Plaintiff's medical file and provided sworn evidence that on July 20th, she examined Plaintiff at approximately 12:50 p.m. "when he reported to medical with a complaint of dizziness since just before lunch." Ex. D, p. 1. She checked Plaintiff's blood sugar and determined that Plaintiff likely had "a hypoglycemic episode." *Id.* No treatment was required at that time, however, because Plaintiff's "blood sugar had returned to high levels after eating his lunch," but Plaintiff was given more instructions concerning diabetes. *Id.*, at 2. Defendant Kent "explained the signs and symptoms of hypoglycemia such as dizziness and confusion." *Id.* She told him to eat when he felt the symptoms of hypoglycemia and provided him with instruction in checking his blood sugar level on Accu-Check prior to taking insulin. *Id.*

Defendant Kent explained that the only other time she saw Plaintiff was on the morning of August 3, 2003, when she conducted a pre-confinement health appraisal on Plaintiff. Ex. D, p. 2. Prior to examining Plaintiff, security called Defendant to verify Plaintiff's passes. *Id.* Defendant advised that Plaintiff had only one valid pass and could work. *Id.* When Defendant arrived to conduct the pre-confinement health appraisal, Plaintiff "was angry and belligerent and wanted to know why [Defendant Kent] reported that he could work when he had a pass that he could not work." *Id.* Plaintiff claimed that he had a "no recreation field" pass and Defendant Kent explained to Plaintiff that even if he had such a pass, which he did not, such a pass is irrelevant for considering whether an inmate can work. *Id.* Plaintiff became loud, argumentative, and his blood pressure was elevated. *Id.* Defendant Kent asked Plaintiff if he was taking his medications, and he answered "no," but when Defendant Kent attempted to talk to

Plaintiff about why he was not taking his medicine, "all [Plaintiff] wanted to do was discuss [Defendant's] name for grievance purposes." *Id.*; *see also* ex. D, p. 6. It was on that same day, August 3rd, that Plaintiff submitted the informal grievance about the July 19th hypoglycemic episode. Ex. D, p. 2.

    Defendant Kent further states in her affidavit that she "cannot recall if [she] was involved in [Plaintiff's] treatment on July 19, 2003." Ex. D, p. 2. She does not remember if she "even saw" Plaintiff that day but, if she was present, asserts that she "would have treated his condition appropriately." *Id.*

    As additional evidence, Defendant Kent has presented the affidavit of Randy Thompson, a correctional officer at Washington Correctional Institution. Ex. F. Officer Thompson states that he recalls arriving in the dormitory in response to a call for assistance and found Plaintiff, who "appeared slow," with a nurse and inmates gathered around them. *Id.*, at 1. The inmates "were agitated" and Officer Thompson remembers thinking that he needed "to remove [Plaintiff] from the dormitory as quickly as possible so that the situation in the dormitory could be diffused and order restored and [Plaintiff] could receive medical are without inmates hovering around or interfering." *Id.* Officer Thompson is not certain which nurse attended to Plaintiff in the dormitory, but he does aver that he "never heard the attending nurse state, 'Get your ass up I don't have time for your b— s—.' " *Id.* Officer Thompson also states that the attending nurse did not tell inmates not to put Plaintiff in the wheelchair but to "let [Plaintiff] get in on his own.' " *Id.*, at 1-2. Officer Thompson is certain that if such language had been used, he "would have definitely remembered it." *Id.*, at 2. After Plaintiff "was removed from the dormitory, the situation stabilized." *Id.*

Case No. 5:04cv144-RH/WCS

The American Diabetes Association "recommends that diabetics maintain preprandial (before meals) blood glucose levels of 90 to 130 mg/dL (plasma blood sample), and peak postprandial (1 to 2 hours after beginning of meal) blood glucose levels less than 180 mg/dL (plasma blood sample)."  Exhibit A, p. 9.  "Symptoms of having low blood glucose (sugar) usually begin at a level below 60 mg/dL and may include shakiness, dizziness, clamminess or sweating, hunger, headache, palpitations, sudden moodiness, crankiness, confusion, and/or convulsions."  *Id.*  If a diabetic needs to raise the blood glucose level to treat hypoglycemia, he "should drink or eat something containing quick acting sugar, such as fruit juice, soda (non-diet), hard candy, or over-the-counter glucose tablets or gel."  *Id.*  Instaglucose (glucose gel) is especially effective for the emergency treatment of low blood sugar because it begins to absorb instantly . . . and brings relief in just minutes."  *Id.*  If there is no response within 10 minutes, another dosage of Instaglucose should be administered.  *Id.*  "If a patient becomes unconscious due to low blood sugar, [he] may be treated with an injection of glucagon (a hormone that causes blood sugar to rise) or administration of concentrated IV glucose through an IV line."  *Id.*, at 9-10.

Finally, Defendant Kent submitted the affidavit of Dr. Daniel Cherry, III, a licensed medical doctor who serves as the Director of Health Services for the Florida Department of Corrections.  Ex. B.  Dr. Cherry states in his affidavit that he reviewed Plaintiff's medical records concerning his treatment and the alleged injuries he received from that treatment.  *Id.*, at 2.  In particular, Defendant notes that the proper treatment for hypoglycemia and symptoms of being lethargic, sweating, and having a blood glucose level of 36 mg/dL is to provide a glucose gel.  *Id.,* at 3.  Should a patient be

Case No. 5:04cv144-RH/WCS

unconscious, the proper treatment would be "administration of concentrated IV glucose through an IV line."  *Id.*

Additionally, Dr. Cherry has stated his professional opinion that treating Plaintiff with two tubes of glucose gel and sugar water "has no correlation whatsoever to the symptoms described by [Plaintiff]."  *Id.*  "Such treatment would not cause complications in swallowing or shortness of breath."  *Id.*  Moreover, Dr. Cherry points out that it was more than eight months after the July 19, 2003, incident until Plaintiff complained about swallowing problems and shortness of breath.  *Id.*, at 3-4.[8]  Dr. Cherry opines that Plaintiff's "isolated complaints of difficulty swallowing and breathing had no relationship to his treatment for hypoglycemia on July 19, 2003."  *Id.*, at 14.

> There is no possibility that the ingestion of Instaglucose gel of the alleged regurgitation of the substance on July 19, 2003, would have caused swallowing or breathing difficulties eight months after the fact.  Each tube of Instaglucose contains only 1.09 ounces of a gel-like substance.  it cannot be 'swallowed wrong' or 'get stuck going down' like pills or large tablets.  Pills, if taken improperly . . . can get stuck in the esophagus and cause local injury, often in the mid-esophagus.  This cannot occur with gel-like substances.

Ex. B, p. 7.  Dr. Cherry states that there is simply "no possibility that [Plaintiff] sustained an esophageal injury from his treatment on July 19, 2003[,] or developed swallowing difficulties in March of 2004 or later by orally ingesting Instaglucose on July 19, 2003."  *Id.*, at 8.  Rather, Plaintiff's "isolated complaints of swallowing difficulties were most likely attributable to dry mouth secondary to his HIV, a common cold, or temporary pill-induced inflammation of the esophagus."  *Id.*  Additionally, any problems with shortness of breath were temporary, isolated, well-removed in time for the July 19th treatment,

---

[8] It was not until March 8, 2004, at Plaintiff's appointment in the chronic illness clinic that he first complained of problems with swallowing.  Ex. B, p. 19.

and are likely second to Plaintiff's "HIV or caused by anxiety, depression, his medications, or other factors, but it could not have been caused by his treatment for hypoglycemia on July 19, 2003." *Id.*, at 15-16.

## V.    Analysis

As an incidental claim to the primary Eighth Amendment claim concerning the medical care Plaintiff received, Plaintiff contends that he was subjected to discrimination in violation of the Fourteenth Amendment.  To establish an Equal Protection Clause violation under the Fourteenth Amendment, a plaintiff must show that a challenged action "had a discriminatory purpose" or intent.  Burton v. City of Belle Glade, 178 F.3d 1175, 1189 (11th Cir. 1999), *citing* Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 481, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997); Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); Washington v. Davis, 426 U.S. 229, 241-42, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).  Furthermore, because "the essence of the equal protection requirement is that the state treat all those similarly situated similarly," Zeigler v. Jackson, 638 F.2d 776, 779 (5th Cir. Unit B, 1981), essential to the claim is a showing that some other group was similarly situated but treated differently.  *E.g.* Fuller v. Georgia State Board of Pardons and Paroles, 851 F.2d 1307 (11th Cir. 1988); Damiano v. Florida Parole and Probation Com'n, 785 F.2d 929, 932 (11th Cir. 1986).  *Cf.* McCleskey v. Kemp, 481 U.S. 279, 107 S. Ct. 1756, L. Ed. 2d 262 (1987).  Equal protection "does not require that all persons be treated identically.  However, if distinctions between similarly situated individuals are to withstand an equal protection analysis, such distinctions must be reasonable, not arbitrary, and must rest on grounds having a fair and substantial relation to the object of

the legislation." Hendking v. Smith, 781 F.2d 850, 851 (11th Cir. 1986), *citing* Stanton v. Stanton, 421 U.S. 7, 14, 95 S. Ct. 1373, 1377, 43 L. Ed. 2d 688 (1975).

Here, Plaintiff has not shown through the presentation of any evidence that he was treated differently from other inmates who were similarly situated with Plaintiff. He has not shown that the named defendant intentionally acted in any manner due to Plaintiff's race, religion, national origin, poverty or any other constitutionally protected interest. Because there is simply no basis to support this conclusory claim, summary judgment should be granted in favor of Defendant on the Fourteenth Amendment claims.

The Eighth Amendment of the United States Constitution requires that prisons provide inmates with "minimally adequate medical care." Harris v. Thigpen, 941 F.2d 1495, 1504 (11th Cir. 1991), *citing* Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976). Deliberate indifference to the serious medical needs of sentenced prisoners violates the Eighth Amendment's prohibition of cruel and unusual punishment. Estelle, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). A "'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1187 (11th Cir. 1994), *quoting* Laaman v. Helgemoe, 437 F. Supp. 269, 311 (D. N.H. 1977). The concept of deliberate indifference entails something more than negligence, but is satisfied by something less than actions undertaken with an intent to cause harm. Farmer v. Brennan, 114 S. Ct. 1970, 1978 (1994). Combining the standards from Farmer and Estelle, the Eleventh Circuit has clarified that, ultimately, there are four

requirements to bringing an Eighth Amendment claim for the denial of medical care: "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts."  Taylor v. Adams, 221 F.3d 1254 (11th Cir. 2000), *cert. denied* 531 U.S. 1077 (2001); Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003).  Put another way, to show that a defendant was deliberately indifferent to the prisoner's serious medical need, Plaintiff must "prove three facts: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir.1999), *cited in* Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004).

   The undisputed evidence presented in this case shows that Officer Thompson arrived in Plaintiff's dormitory in response to a call for assistance.  Plaintiff had a nurse and other inmates gathered around him when he arrived.  The attending nurse did not curse at Plaintiff or tell inmates not to put Plaintiff in the wheelchair.

   Plaintiff arrived in the medical unit and was lethargic, sweating, and exhibited signs of low blood glucose.  Plaintiff's blood glucose level was checked on an Accu-Check monitor and registered 36 mg/dL.  Plaintiff was given two tubes of glucose gel and sugar water by a nurse, and he was observed for two hours while in the infirmary. Plaintiff's blood sugar level was raised sufficiently and Plaintiff was released back to the dormitory.

   This evidence shows that Plaintiff was given appropriate medical treatment and did not suffer any problems following that treatment.  There is no evidence that Plaintiff did not receive proper medical care, that the care was delayed unnecessarily, or that

Case No. 5:04cv144-RH/WCS

medical personnel were callously indifferent to Plaintiff's need for care.  There is also no evidence in this record that another inmate provided medical treatment to Plaintiff rather than the attending nurse.  Plaintiff has not come forward with any evidence to show the denial of his Eighth Amendment rights.

Moreover, the only evidence before this Court is that the medical treatment provided to Plaintiff on July 19th was given to him by Nurse Rudolph, not the named Defendant.  Even if there were a possible Eighth Amendment claim (and there is not on this record), Defendant would be entitled to summary judgment in her favor because there is no evidence of a connection to Plaintiff's treatment and her involvement.

The claims in this case are unsupported.  Accordingly, the claims are frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B)(i).

## VI.   CONCLUSION

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendant's motion for summary judgment, doc. 47 and 52, be **GRANTED** and the Clerk be directed to enter judgment in favor of Defendant Kent on all claims, noting in the judgment that the claims were frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B)(i).

**IN CHAMBERS** at Tallahassee, Florida, on February 13, 2006.


   s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**